THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| JESSICA SECKMAN, | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Plaintiff,* | ) | Case No. 1:25-cv-01220-MSN-LRV |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| COUNTY OF FAIRFAX, | ) | |
| | ) | |
| *Defendant.* | ) | |
| _____ | ) | |

## FIRST AMENDED CIVIL ACTION COMPLAINT

Plaintiff Jessica Seckman, by and through her undersigned counsel, alleges for her Amended Complaint against Defendant County of Fairfax as follows:

## INTRODUCTION

This action has been initiated by Plaintiff Jessica Seckman (hereinafter referred to as "Plaintiff" or "Ms. Seckman") against Defendant County of Fairfax (hereinafter referred to as "Defendant" or "FFX"), for damages and injunctive relief under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 et seq., the Rehabilitation Act, and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq.:

Additionally, Plaintiff brings this action to redress Defendant's pervasive and unlawful disability discrimination, failure to accommodate, retaliatory conduct for protected activity, hostile work environment, and unlawful termination. This amended complaint is pleaded to address the Court's concerns regarding timeliness, administrative exhaustion, and factual specificity by (a) identifying timely actionable events for each count, (b) separating older allegations as background

1

context where appropriate, and (c) providing transaction-level factual detail for the FMLA and accommodation-related claims.  Plaintiff received her original Notice of Right to Sue dated April 23, 2025, and filed the Original Complaint within 90 days of receipt.  Plaintiff received her second Notice of Right to Sue dated December 8, 2025, and files this Amended Complaint within 90 days of receipt.

## JURISDICTION AND VENUE

1. This Court has original subject matter jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1331 and 1343, 29 U.S.C. § 2617(a)(2), and 42 U.S.C. § 12117(a) because it arises under the laws of the United States and seeks redress for violations of federal laws. This Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367, because they arise out of the same common nucleus of operative facts as her federal claims.

2. Pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2), venue is proper in this district because all of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district, and Defendant is deemed to reside where it is subject to personal jurisdiction, and Defendant is a resident of Virginia.

## PARTIES

3. Plaintiff is a female over the age of 18 and a resident of Centreville, Virginia. She was employed by the County of Fairfax as a Social Services Specialist II from October 15, 2018, until her termination on April 22, 2025.

4. Defendant County of Fairfax is a political subdivision of the Commonwealth of Virginia and Plaintiff's former employer, and is subject to the ADA, Rehabilitation Act,  FMLA, and the Virginia Human Rights Act

**ADMINISTRATIVE EXHAUSTION AND PROCEDURAL POSTURE**

5.      Plaintiff's first charge of disability discrimination was timely filed with the Equal Opportunity Commission (EEOC) on September 17, 2024.  The statutory period for this charge is all actions after September 22, 2023.

6.      Plaintiff received a Notice of Right to Sue (NRTS) charge 570-2024-04735 on or about April 23, 2025.

7.      Plaintiff filed her original complaint in this case within 90 days of receiving the NRTS.

8.      The original complaint was dismissed without prejudice on or about October 17, 2025.

9.      Plaintiff filed a second EEOC charge No. 570-2025-03718 on or about July 5, 2025, related to additional retaliation and discriminatory acts occurring in 2025 including her eventual termination.

10.     The statutory period for this second charge stretches back to September 8, 2024.

13.     On December 8, 2025, the EEOC issued a second NRTS letter, which lead to the timely filing of this Amended Complaint.

**FACTUAL BACKGROUND**

14.     Plaintiff grew up in a rural town in West Virginia, overcoming economic hardship to excel academically, athletically, and in leadership, fostering a lifelong commitment to serving disadvantaged communities.

15.     Plaintiff earned dual degrees, Bachelor of Arts in Sociology and Anthropology, from West Virginia University and participated in international advocacy for refugee children before relocating to the Washington, D.C. area, where she worked for nonprofits serving vulnerable populations.  Plaintiff earned a community partnership award from the County of Fairfax in 2017.

I.      BACKGROUND OF PLAINTIFF'S RELATIONSHIP WITH MS. JOSEPH

3

16.     Plaintiff began employment with Defendant on or about October 15, 2018, and at all relevant times performed the duties as required.

17.     During her first year of employment, Plaintiff was supervised by Lorrie Joseph (hereinafter "Ms. Joseph").

18.     During that first year, Ms. Joseph made multiple critical and denigrating comments to Plaintiff, criticizing her appearance, her apparel, and referring to Plaintiff as "girl," rather than treating Plaintiff as a professional.

19.     Plaintiff made a complaint during a meeting about the way Ms. Joseph (who is in her fifties), continued to make negative comments about Plaintiff and her generation.

20.     Ms. Joseph's demeaning comment was made in front of the entire team and staff, as was Plaintiff's objection to such a comment.  This interaction caused tension between Plaintiff and Ms. Joseph.

21.     As a result of that complaint, Ms. Joseph attended a training specifically focused on working with people of a younger generation.

22.     During this initial time that Plaintiff worked for Ms. Joseph, Plaintiff did not mention her medical conditions to Ms. Joseph, because Plaintiff was already having difficulty being taken seriously by Ms. Joseph.

23.     In 2019, Ms. Joseph was promoted, and transferred away from supervising Plaintiff.

   II.    PLAINTIFF'S REPORTING OF HER DISABILITIES AND INITIAL REASONABLE ACCOMMODATIONS

24.     Plaintiff is a qualified individual with a disability, including an auto-immune disorder, Ehlers Danlos Syndrome, Lipedema, ADHD and related mental health conditions such as PTSD, anxiety, and depression.

25.    Plaintiff's genetic condition causes severe edema (swelling) in her legs when she is in a seated position for long periods of time.  This condition causes pain, but it also runs the risk of creating life threatening blood clots.

26.    Lipedema and Ehlers Danlos Syndrome are connective tissue disorders that impact all over Plaintiffs joints, tissues.  These conditions exacerbate the risk of serious complications due to a severe lower leg injury Plaintiff suffered in an accident in 2011.

27.    Plaintiff has metal implanted into her leg and it frequently swells to the point that it impacts mobility.

28.    Plaintiff also suffers from Mast Cell Activation Syndrome (MCAS), which is a chronic condition where Mast Cells inappropriately and excessively release inflammatory chemicals that cause hives, which is an itchy and painful skin irritation.  It is made more severe by stress.

29.    Plaintiff also suffers from diagnosed ADHD, which is adversely impacted by working in a noisy or frenetic environments.  She takes medication for ADHD which can cause side effects.

30.    Due to these conditions, Plaintiff was at high risk of serious infection during the COVID 19 pandemic.  Therefore, her physician recommended that she work from home as a reasonable accommodation of her disability.

31.    Plaintiff provided Defendant with notice of her disabilities through medical documentation, communications with supervisors and HR, leave requests, and/or Plaintiff's accommodation requests that took place in 2019.

32.    Plaintiff was provided certain reasonable accommodations, including telework arrangements that enabled Plaintiff to continue working and performing job duties.

33.    Plaintiff also required reasonable accommodation after surgery on her ankle in 2021, which left her wheelchair bound.

34.    Through most of her time employed by Defendant, and particularly when she did not report to Ms. Joseph, Plaintiff was recognized as a high-performing employee, receiving multiple awards, and serving on advisory councils.

### III.    PLAINTIFF THRIVED WHEN HER DISABILITIES WERE ACCOMMODATED AND SHE DID NOT REPORT TO MS. JOSEPH

35.    From December of 2019 to November of 2022, Plaintiff reported to Mary Lou Neal (hereinafter "Ms. Neal").  During this time Plaintiff helped the county to use more inclusive language in their systems, was awarded for her work with the unhoused community, and was nominated and received an award in 2022 and 2023, and was given an $15,000 raise.

36.     All of the staff was working remotely in 2020.  Due to her conditions, Plaintiff's physician recommended accommodation of telework that covered 2021.

37.    Plaintiff was doing well working from home, as evidenced by the accolades and raise, and it proved to be very beneficial to her underlying health conditions.

38.    Plaintiff continued to be very productive during that time, and she was also benefitting from a collegial supervisor, who supported her.

### IV.    MS. JOSEPH RETURNED TO SUPERVISING PLAINITFF

39.    In November of 2022, Plaintiff learned that Ms. Joseph was going to return to be Plaintiff's supervisor.

40.    Based on her past experiences with Ms. Joseph, Plaintiff express to Ms. Neal  that she had real concern about working with Ms. Joseph again, and that stress and anxiety level triggered and exacerbated some of her chronic debilitating symptoms.

41.    Unfortunately, Plaintiff's fears proved to be justified.

42.    On or about December 8, 2022, Plaintiff attended a holiday party at Guapo's Restaurant in Fairfax, VA.

6

43.     When Plaintiff was leaving the restaurant, she was approached in the parking lot by Ms. Joseph, who was introduced at the party as the new supervisor.

44.     By the tone of the conversation, Ms. Joseph was clearly aware of the fact that Plaintiff was working remotely, and she questioned Plaintiff about when she was planning to return to working in the office.  Specifically, Ms. Joseph said: "you have to come back to the office at some time, you can't stay at home forever," or words to that effect.

45.     Plaintiff was taken aback by this comment, as she had just informed Ms. Joseph that her telework was part of a disability reasonable accommodation, and also part and parcel of her approved intermittent FMLA.

46.     Plaintiff used intermittent FMLA to go to a regularly scheduled doctor's appointment every Wednesday, and to seek treatment when emergency flair ups of her condition occurred.

47.     Plaintiff asserts that this conversation with Ms. Joseph made clear that Ms. Joseph was hostile towards the idea of Plaintiff working from home, regardless of the reason for it.

48.     Ms. Joseph became Plaintiff's supervisor on or about December 12, 2022.

   V.     MS. JOSEPH'S HOSTILITY TO PLAINTIFF'S NEED FOR A REASONABLE ACCOMMODATION

49.     Plaintiff met with Ms. Joseph on a Microsoft Teams call on or about December 15, 2022, in which Plaintiff again mentioned that she had a reasonable accommodation of telework due to her ADHD and her other medical conditions.

50.     During this conversation, Ms. Joseph stated to Plaintiff that ADHD was not a disability, or words to that effect and continued to make more degrading comments such as "that explains it" as if somehow the condition was the reason for their past interactions.

51. After the holidays, during the first week of January, Plaintiff went to the office to take flowers to a colleague who was retiring. In front of Plaintiff and two other people, Ms. Joseph asked Plaintiff when she was going to return to working from the office.

52. Plaintiff was embarrassed and humiliated by being confronted about medical issues in front of others. She repeated to Ms. Joseph that she was teleworking due to her medical conditions.

53. Ms. Joseph was not satisfied with Plaintiff's response, and continued to harp on the issue, until Plaintiff revealed the medical conditions that necessitated her telework.

54. Plaintiff was extremely upset by this public confrontation, and her co-worker, Arthi Krishendra (hereinafter "Ms. Krishendra"), comforted Plaintiff, agreeing that the confrontation was totally inappropriate.

55. This was the second time that Ms. Joseph made it patently clear that she was extremely hostile and averse to the reasonable accommodation that had been implemented for Plaintiff.

VI.    CREATION OF A HOSTILE WORK ENVIRONMENT PRIOR TO THE STATUTORY PERIOD

56. Immediately upon returning to work after the New Year, Plaintiff annotated in the schedule that she would be out on that Wednesday for her regularly scheduled Wednesday medical appointment.

57. Ms. Joseph confronted Plaintiff about being unavailable during her medical appointment, and Plaintiff informed Ms. Joseph that it was part of her approved intermittent FMLA.

58. Although the intermittent FMLA had already been approved, Ms. Joseph demanded that Plaintiff provide her with a doctor's note that laid out the schedule of her doctor's appointments.

59. Again, this was a hostile and totally unnecessary request that clearly intruded on Plaintiff's privacy.

60.     Plaintiff reported the incident to Dan Yurkovic (hereinafter "Mr. Yurkovic") in Human Resources (HR), who confirmed that Plaintiff did not have to provide a doctor's note to Ms. Joseph as the FMLA had already been approved.  He also said that he would follow up with Ms. Joseph regarding FMLA procedures.

61.     Additionally, when Plaintiff returned to work after the holiday vacation, she found that Ms. Joseph had gone into Plaintiff's case files and written notes, and taken actions that jumbled up the case files.

62.     Plaintiff had disclosed to Ms. Joseph that she used a strict organization of files to make it easier for her to manage the ADHD symptoms that make it difficult for Plaintiff to organize her thoughts.

63.     Ms. Joseph scrambled Plaintiff's files specifically to agitate Plaintiff and to sabotage the system Plaintiff used to help her execute her duties.

64.     Not only did this leave Plaintiff with a great deal of extra work to ascertain what she still needed to be doing, it exacerbated Plaintiff's ADHD symptoms, leaving her frustrated and emotionally exhausted.

65.     Around the second week of January of 2023, Plaintiff had a phone call with Ms. Joseph to try and unpack what she still needed to do, and in that call, Ms. Joseph admitted that she should not have altered and made notes in Plaintiff's files.

66.     In short, Ms. Joseph admitted that she intentionally altered Plaintiff's files and that she knew doing so would hamper Plaintiff in the execution of her duties.

67.     On or about January 17, 2023, Plaintiff had an unexpected medical episode that required her take FMLA sick leave.  Rather than being understanding, Ms. Joseph told Plaintiff that she was not allowed to take unscheduled FMLA, which was false as a matter of law and policy.

9

68.    Plaintiff reported Ms. Joseph's actions to Mr. Yurkovicic, who agreed to have a conversation with Ms. Joseph to explain FMLA policies.

69.    Thereafter, Ms. Joseph began to deny Plaintiff flex hours to accommodate her doctor's appointments if they were required due to an unplanned episode, insisting that flex hours could only be used if they were scheduled in advance.

70.    Ms. Joseph also denied Plaintiff the ability to work overtime or use compensatory time (CTE) to accommodate her appointments.

71.    Plaintiff asserts that Ms. Joseph's rigidity and denial of flex time was retaliatory in nature, as there was no such restriction on Plaintiff's colleagues, and Plaintiff's previous supervisor had no such restriction.

72.    When Plaintiff raised this issue to Mr. Yurkovic, he informed her that the use of flex time was up to the discretion of the supervisor.

73.    Plaintiff asserts that even when a supervisor has discretion, if the discretion is used to punish someone because of disability, such action violates the law.

74.    Plaintiff notes that until Ms. Joseph was reassigned to be her supervisor, there had been no issues with her accommodation, her use of FMLA, or her productivity.  The problems arose entirely because of Ms. Joseph's hostility towards Plaintiff's disability and need for accommodation.

75.    During this time, Plaintiff experienced disability-related hostility, skepticism regarding her medical limitations, and conflict regarding medically supported leave and accommodation requests by supervisor(s), including Ms. Joseph.

76.     She was also held to different standards then other employees such as being admonished for recording a negative interaction with Ms. Joseph, despite Virginia being a one party consent state and Fairfax County not having a policy forbidding the action.

77.     Ms. Joseph also attempted to block Plaintiff from being on a committee that she was hand selected for because of her disability.  The committee was on inclusion and equity and Plaintiff was uniquely suited to be on it.  She was selected for the committee because of an essay she wrote on disability inclusion.

78.     Plaintiff alleges that these earlier incidents included statements and conduct reflecting disbelief of Plaintiff's disabilities and resistance to accommodation, as more fully set out in the original complaint and supporting records.

79.     Plaintiff includes these allegations as context for Defendant's later actions, knowledge, and motive, and not as independently actionable discrete adverse acts except to the extent any such acts fall within the applicable limitations period for a specific claim.

80.     On or about January 27, 2023, Plaintiff applied for a Social Services Specialist III position within her department, which was a supervisory role.  Ms. Joseph was on the selection panel for the position.

81.     On or about February 7, 2023, Ms. Joseph called Plaintiff to inform her that she did not get the job, and told Plaintiff that even though she was clearly qualified and enthusiastic, it was not the best time to promote Plaintiff because Plaintiff needed to focus on her health, or words to that effect.

82.     Plaintiff asserts that this was yet another indication of Ms. Joseph's animus towards Plaintiff because of her need for reasonable accommodation.

83.    During this time, Ms. Joseph began to weaponize Plaintiff's need for FMLA, by assigning Plaintiff more work than her peers, and loading up work for Plaintiff at times when she needed to take FMLA leave.

84.    On or about February 17, 2023, Plaintiff had a Microsoft Teams call with Ms. Joseph to try to find some sort of compromise with Ms. Joseph on the assignment of work.  Plaintiff tried again to explain to Ms. Joseph how her ADHD affected her work style to see if there was some way to meet in the middle or compromise to meet the work demands.

85.    During that conversation, Ms. Joseph again stated that ADHD is not a disability.  Plaintiff again attempted to explain that it was a disability, and that it has been recognized as a disability for years.

86.    At that point, Ms. Joseph accused Plaintiff of having difficulty with time management. Plaintiff disagreed with her, pointing out how productive she was under the previous supervisor.

87.    Ms. Joseph again denigrated Plaintiff and indicated that she could never be supervisor with the kind of issues she had.  Ms. Joseph refused to listen to, or acknowledge the fact that she had drastically increased Plaintiff's workload specifically to make it appear as if Plaintiff had time management issues.

88.    Plaintiff reported this to HR who did not engage and said simply that it was the supervisor's discretion to determine the schedule of employees.

89.    On or about February 22, 2023, a need for overtime work emerged because a client was being evicted from their housing.  It was typical that when such emergencies arose, staff were allowed to work overtime.

90.    In this case, Plaintiff was denied overtime because she had taken FMLA earlier in the day to go to her doctor's appointment.

91. In order to place Plaintiff in maximum distress, Ms. Joseph not only increased Plaintiff's case load, but she also increased the shifts in which Plaintiff would be assigned to man the phones to take calls from the community.

92. It was supposed to be 35% of the day to leave time to work on cases. Ms. Joseph made it 50% of Plaintiff's day, leaving Plaintiff less time to work on cases, while at the same time increasing the case load.

93. Her claim was that it was Plaintiff's responsibility to man the phones due to call outs because of her use of FMLA.

94. On or about March 3, 2023, Plaintiff was selected to be on the Visions and Values committee of the department, which was an honor and accolade. Ms. Joseph denied Plaintiff the opportunity because Plaintiff was using FMLA and needed a reasonable accommodation.

95. She claimed that Plaintiff would not have time due to her schedule and need for FMLA and doctor's appointments.

96. Plaintiff asserts that this is a specific example of unlawful retaliation.

97. On or about March 7, 2023, Plaintiff filed a grievance against Ms. Joseph for retaliation and interference with FMLA.

98. The grievance went to Step III of the grievance process. While the Defendant denied the grievance, it did require Ms. Joseph to attend additional training.

99. Ms. Joseph retaliated against Plaintiff for filing the grievance, and wrote a note to Plaintiff's file that she was not following proper procedures.

   VII. DISABILITY DISCRIMINATION AND RETALIATION WITHIN THE STATUTORY PERIOD STARTING ON NOVEMBER 22, 2023

100.    As a result of Ms. Joseph's rampant increase in Plaintiff's case load, Plaintiff's symptoms had begun to exacerbate and her physician concluded that Plaintiff was suffering from PTSD-like symptoms because of Plaintiff's negative interactions with Ms. Joseph.

101.    Plaintiff's physician recommended that Plaintiff be given additional time to work on cases as a reasonable accommodation of her ADHD.

102.    On or about September 19, 2023, Plaintiff provided Defendant with documentation in support of this reasonable accommodation.

103.    Instead of engaging in an interactive process with Plaintiff, Defendant flat out denied the requested accommodation in December of 2023.

104.    Defendant did not suggest, let alone establish, that accommodation requested would cause an undue hardship on Defendant.

105.    This constituted a denial of a reasonable accommodation within the statutory period.

106.    From that point on, Defendant started to refuse to approve Plaintiff's FMLA paperwork.

107.    Despite being denied the reasonable accommodation of extra time, Plaintiff proved that she was a high-performing employee who received multiple accolades, including the 2023 "Commitment to the Community" award, and an appointment by the board of supervisors of Fairfax County to the Fairfax County Young Adult Advisory Council, where she was elected Vice Chair in 2024.

108.    Plaintiff filed multiple internal grievances beginning in March 2023 and eventually filed an EEOC charge on August 17, 2024.  Plaintiff's filing of an EEOC charge constituted protected activity.[1]

109.    Despite medical documentation supporting her need for accommodations, Defendant refused the accommodations requested, and instead, spent months demanding additional

---

[1] Plaintiff also filed complaints internally and with the Department of Labor in August of 2024.

information, pretending that the information provided was insufficient, and sending Plaintiff around on a wild goose chase to appease what was clearly a management team that did not want to keep Plaintiff employed.[2]

110.    At this point, Defendant was aware that Plaintiff had made protected disclosure and did nothing to help her.

111.    Plaintiff was also going through the process of requesting an accommodations of a reassignment, which is allowable under Federal Statutes.

112.    This request was originally denied during earlier grievances despite Plaintiff's doctor writing a letter on October 1st 2024 requesting a new placement or a job assistant.

113.    Plaintiff asserts that Defendant did not engage in good faith efforts to find an appropriate accommodation, but rather, used the administrative process to frustrate and demoralize Plaintiff.

114.    Whenever Plaintiff identified another position with Defendant's organization, Defendant would find some excuse as to why Plaintiff could not be placed in that position.

115.    For example, on or about October 22, 2024, Angela Watkins from HR (hereinafter "Ms. Watkins") concluded that Plaintiff could only look for alternative positions outside of the NCS agency.  This requirement was not based in any business justification and was contrary to the recommendation of Plaintiff's physician.

116.    Additionally, Ms. Watkins insisted that Plaintiff could not look for any position that could be construed as a promotion, even if she was fully qualified for such a position.

117.    Plaintiff asserts that Defendant's refusal to place her in another position constituted bad faith, and demonstrated its animus towards her.

---

[2] Defendant was also repeatedly asking Plaintiff for more documentation in support of her requests for FMLA leave.

118.    In addition to placing irrational and unjustified limitations on what alternative positions Plaintiff could access, Defendants threatened to remove previously approved accommodations, which left Plaintiff unsure of what accommodations she actually had.

119.    For instance, on or about December 12, 2024, Plaintiff was granted an accommodation relating to interview preparation for an opportunity on a new team, and potentially a fresh start.

120.    After granting and agreeing to this as an accommodation, Defendant backpedaled and failed to honor, withdrew, and otherwise undermined that accommodation.

121.    This lead to Plaintiff being so frazzled and anxious that she was unable to participate in the interview.  When Plaintiff attempted to reschedule the interview, Mr. Rey refused to extend the accommodation Plaintiff had asked for and was granted.

122.    In another example, on or about March 3, 2025, Defendant proposed three alternative positions in the Tax Administration department.

123.    Plaintiff has no background or experience in tax administration, and all of the positions proposed were non-merit positions with lower salary grades, reduced benefits, and no pension eligibility.

124.    All of these positions constituted a clear demotion for Plaintiff.  However, when Plaintiff found positions that were suitable, Defendant rushed to fill those positions with other applicants, to block any reasonable transfer for Plaintiff.

VIII.    DEFENDANT'S INTERFERNCE WITH, AND DENIAL OF FMLA LEAVE WITHIN THE STATUTORY PERIOD

125.    Additionally, despite being approved for intermittent FMLA leave, Defendant repeatedly denied Plaintiff's requests for leave to attend medical appointments, which was contrary to FMLA regulations.

126.    Specifically, Plaintiff alleges that she was denied FMLA leave during the statutory period, on the following dates[3]:

- July 12-August 5, 2024, requested extended FMLA, and denied on July 31, 2024.
- August 6, 2024 FMLA requested; denied on August 14, 2024
- August 15, 2024  out on FMLA leave (FMLA related event); FMLA treatment denied and told it was going to be unpaid time off;
-  August 20, 2024, Plaintiff resubmitted request for FMLA; did not hear back until more than a week later.
- 

At all times listed above, Plaintiff was eligible for FMLA leave.[4]

127.    On several occasions, Ms. Joseph attempted to persuade Plaintiff to change appointments around to accommodate the schedule.

128.    Plaintiff brought this issue to HR and HR interceded to allow Plaintiff to accommodate her appointments.  However, on at least one occasion, Mr. Rey refused to allow Plaintiff to move her schedule to accommodate an appointment.

129.    Plaintiff's supervisor repeatedly demanded that Plaintiff re-submit medical documentation and detailed schedules despite Plaintiff already having approved FMLA leave, creating unnecessary barriers to Plaintiff's legally protected leave.

130.    Plaintiff made good-faith efforts to establish a predictable medical appointment schedule to minimize disruption, but was nevertheless subjected to repeated scrutiny and documentation demands by Defendant.

131.    Throughout 2024 and 2025, Defendant repeatedly sat on emails and requests from Plaintiff, leaving them unanswered for weeks or months, exacerbating her anxiety and preventing timely access to medical care or workplace support.

---

[3] Plaintiff filed suit on July 22, 2025.  FMLA has a one year statute of limitations, and thus all improper FMLA denials that took place after July 22, 2024 are timely asserted and properly before the Court.

[4] Plaintiff received a reduced paycheck because Defendant had refused to approve her FMLA for weeks while demanding more paperwork from her.

132.    At one point in August 2024, HR rescinded her FMLA leave while Plaintiff was already using it and ordered her back to work.

133.    On another occasion, around January 28, 2025 Plaintiff was informed that her FMLA had ended and was used and Plaintiff was not able to code my time-on-time sheet accordingly. Plaintiff had to reach out to get clarification from HR by sending an email.

134.    This notification was obvious retaliation from actions taken the day before in which Plaintiff's counsel and Medical Doctor had again reached out to County representatives to inquire about the accommodation process.

135.    On or around January 29, 2025 Plaintiff reached out to HR regarding a non FMLA extension. This was an idea she learned about form the union.

136.    Again Plaintiff inquired about the potential for an extraordinary leave request to be granted.

137.    HR wrote back they would get in touch with me by the next day.

138.    On or around January 30, 2025, HR responded stating that the non-FMLA extension was approved for 4 weeks from 1/14 until 2/7.

139.    It is obvious by doing the simple math that this is incorrectly calculated as it was not a full 4 weeks thus interfering yet again with Plaintiff's ability to use FMLA granted leave.

140.    On or around January 31, 2025 Plaintiff advised Mr. Rey of needing to use FMLA in the near future.

141.    He responded by saying words to the effect of "well if I let you off for an appointment I have to let everyone off, how is that fair". A response and idea that bears no consequence when an individual is using FMLA.

142. Plaintiff did the only thing she could and emailed HR to notify them of this FMLA violation.

143. On or around February 6, 2025, on February 6, 2025, Plaintiff was informed that her non-FMLA leave would end on February 10, 2025, leaving her with only four days of leave remaining.

144. In an email HR, stated words to the effect of "Your 480-hour entitlement was exhausted on 1/14/25, with 1.3 hours of FML coded on that day. I apologize for miscalculating the 4-week extension of non-FML leave. The non-FML extension period is 1/14/25 – 2/10/25. "

145. HR additionally stated that the ADA request was being worked on with the county attorney, Christina Hamilton.

146. During Plaintiff's tenure Defendant failed to inform Plaintiff of key FMLA deadlines, miscalculated her leave eligibility, and delayed processing leave donations.

147. In fact, Plaintiff was forced to apply for an extension of non-FMLA leave because Defendant had incorrectly tallied her FMLA leave.

148. This was especially prevalent after the time she filed the original EEOC complaint which again points to obvious retribution and retaliation because in years prior before the complaint Defendant always notified Plaintiff when her leave was running out.

149. Additionally, HR acknowledged that the Extraordinary sick leave request was denied saying "ESL is typically approved in cases with extensive medical aspects, often terminal in nature. Your request for ESL is denied."

150. At this point Plaintiff was desperate and relying on donated leave from her compatriots, which she was aware of being donated by evidence from colleagues.

151. On or around Plaintiff followed up with John Lieberman, asking for an update on how many hours had been donated, as my donated leave balance still showed only 1.8 hours.

152.    It was only after she specifically requested an update that Plaintiff was informed that 70 hours were available from HR to use until March 26, 2025 and that any request after that date will be denied.

153.    This action again shows HR's animus towards Plaintiff and their general dismissive nature toward Plaintiff and her legally protected requests.

154.    Throughout this process Defendant continually denied Plaintiff's access to legally allowed reasonable accommodation(s), retaliated against her for protected activity, retaliation for trying to express her rights, interfered and/or denied her access/use of FMLA, and exposed her to an abhorrent working environment.

IX.    DEFENDANT'S DISPARATE TREATMENT OF PLAINTIFF WITH RESPECT TO OTHER FORMS OF LEAVE

155.    Between August 2024 and March 2025, Plaintiff repeatedly sought donated leave, extraordinary sick leave, and reassignment to open roles that would not exacerbate her condition.

156.    At each instance, Defendant obstructed her, failed to respond to her, or increased her burden by demanding unnecessary and duplicative information.

157.    As early as August 2024, Plaintiff requested extraordinary leave and did not receive an answer for months.

158.    On or about September 17, 2024, Plaintiff filed an EEOC Charge, and in doing so, engaged in protected activity.

159.    Defendant was placed on notice of Plaintiff's protected activity by October 17, 2024, and provided a position statement to the EEOC thereafter.

160.    Plaintiff asserts that extraordinary leave is granted to others when it was denied to her. Plaintiff was informed by the union that a colleague of hers had cancer who was allowed to use extraordinary leave well past the usable amount because she was favored by management.

161. County policy permits extraordinary sick leave for significant medical conditions, yet Defendant refused to grant Plaintiff such leave despite documented medical necessity, thereby exacerbating Plaintiff's health conditions.

162. Defendant denied the request, stating that Plaintiff's condition did not qualify as 'terminal in nature,' further demonstrating Defendant's rigid and discriminatory handling of leave requests for employees with disabilities.

163. It is not true that Defendant only provides extraordinary leave for illnesses that are "terminal in nature." It has provided such leave to others for conditions that were not terminal.

164. Despite Defendant's efforts to frustrate Plaintiff's efforts to find another position, Plaintiff continued to seek a new position within Defendant's organization.

X.    PLAINTIFF'S REASSIGNMENT AND TERMINATION

165. In October of 2024, Plaintiff was ostensibly reassigned to be supervised by Mr. Rey.

166. This was ineffective because Mr. Rey did not supervise anyone at Plaintiff's level and then proved to be an absentee supervisor who did not pay attention to Plaintiff's work.

167. This proved especially difficult for Plaintiff because on certain occasions she was required by policy to involve a supervisor as soon as possible.

168. For instance, on or about January 31, 2025, Plaintiff received a call that needed urgent help because the caller was suicidal and homicidal, threatening to drive their vehicle into active traffic.

169. Despite multiple efforts to reach Mr. Rey, he was not reachable and Plaintiff had to handle the crisis on her own, and eventually reached out to her previous supervisor, Ms. Neal for support to communicate with law enforcement.

170. HR also failed to notify other workers and stakeholders that Plaintiff had been reassigned, which resulted in Plaintiff having to continue interacting with Ms. Joseph because of matters that were routed through Ms. Joseph instead of Mr. Rey.

171. At this time, Plaintiff's symptoms and pain were more severe, and she needed more intervention and regular appointments with her health care providers.

XI. PLAINTIFF'S REQUEST FOR ACCOMMODATIONS IN THE FALL OF 2024

172. On or about October 1, 2024, Plaintiff's physician again submitted paperwork required for another request for accommodations, this time seeking a reassignment away from the hostile conditions that were causing Plaintiff's health to worsen, and/or for a job aide.

173. Contrary to legal requirements, Defendant did not engage in any kind of interactive process with respect to the accommodations requested.

174. When Plaintiff informed Mr. Rey about her accommodations, he was dismissive and stated that granting accommodations to Plaintiff would require him to "let everyone have them."

175. Mr. Rey unilaterally rejected and disapproved recommendations from Plaintiff's medical providers based on nothing but Mr. Rey's own opinions.

176. At no time did Mr. Rey, or any other agent from Defendant refer Plaintiff to an independent medical examiner, or involve any other health care professional in assessing Plaintiff's need for an accommodation, or the reasonableness of the accommodations requested.

177. Mr. Rey went by his own "gut" and only accommodated what he thought was necessary.

178. On or about February 7, 2025, Plaintiff specifically requested for an accommodation of flexing her schedule to accommodate recurring medical appointments.

179. Despite multiple follow-ups, she received no timely response and was forced to cancel her appointment, incurring a financial penalty.

180. On February 11, 2025, Plaintiff was forced to cancel a physical therapy appointment due to Defendant's failure to respond to her request to flex her schedule, exacerbating both her physical pain and mental distress.

181. Plaintiff explicitly advised Defendant that this pattern was harming her health and also causing her undue expenses due to having to cancel appointments.

182. This lack of accommodation directly impacted Plaintiff's health and finances.

XII. DEFENDANT RESCINDED ANY PREVIOUS ACCOMMODATIONS IN APRIL OF 2025

183. As of February 2025 events, Defendant had notice of Plaintiff's medical limitations and need for the requested schedule/leave accommodation through prior documentation and multiple communications.

184. A few weeks later, sometime in March 2025, Plaintiff, her doctor, and her legal counsel all reached out to HR requesting information on previously requested accommodations.

185. In response, on or about April 7, 2025 HR reached out to Plaintiff and notified her that they would not be moving forward with her accommodation requests and that all previously approved accommodations were rescinded.

186. Plaintiff asserts that to the extent she was being accommodated at that time (which was sporadic and unpredictable), Defendant rescinded the accommodations in retaliation for Plaintiff involving legal counsel and threatening legal action.

187. Plaintiff was concerned and quickly sought clarification and/or continuation of her accommodations, including telework, flex scheduling, additional time, workload/caseload adjustments, and reassignment exploration.

188. Defendant did not reply in a timely manner to Plaintiff or her legal counsel.

189. When the Defendant finally responded, they provided unclear, delayed, or contradictory responses that interfered with Plaintiff's accommodation and ability to perform work.

190. Defendant responded by placing Plaintiff on administrative leave and/or initiating a medical separation process while Plaintiff was dealing with disability-related limitations, leave issues, and unanswered questions.

191. Plaintiff asserts that she was completely capable of executing her duties had Defendant simply acceded to the accommodations she requested.

192. Defendant's responses before and after this action were unclear and did not specifically say which accommodations were being rescinded but alleged that because of her accommodations, Plaintiff was not accomplishing her duties.

193. Plaintiff categorically denies that she was failing to accomplish her duties, and states that she was managing her workload, despite Defendant's obstruction and creation of a hostile work environment.

194. Defendant's ambiguity regarding Plaintiff's ability to perform her essential job functions further contributed to the hostile and discriminatory environment.

195. On March 25, 2025, Plaintiff's treating mental health provider explicitly linked Plaintiff's PTSD and worsening mental health to workplace discrimination and Defendant's failures to implement reasonable accommodations, confirming that Defendant's actions have caused substantial harm to Plaintiff's health.

XIII. DEFENDANT PLACES PLAINTIFF ON INVOLUNTARY LEAVE

196. After being placed on administrative leave in April 2025, Plaintiff sought clarification regarding her schedule because she was still scheduled for multiple phone intake shifts.

197.    Defendant failed to promptly inform Plaintiff and other staff of her leave status, creating confusion and anxiety over her responsibilities and further contributing to the hostile work environment.

198.    On April 8, 2025, Plaintiff's treating physician determined she was unable to continue work without an accommodation.

199.    At this time, Plaintiff also applied for long term disability, a program which she had paid into through the county, and was denied because her condition was "pre-existing."

200.    Defendant used the fact that Plaintiff missed days that were covered by leave that she had been granted.

201.    Plaintiff appealed the proposed separation, but her appeal was denied by the same stakeholders that had originally decided to terminate her rather than meet their legal obligations to provide reasonable accommodations.

202.    Plaintiff was formally terminated on April 22, 2025.

203.    Only on that date did Defendant inform Plaintiff that her benefits would terminate on May 1, 2025.

204.    Plaintiff's post-termination grievance and reinstatement request were rejected. Despite identifying multiple open positions for which she was qualified, HR refused to consider placement in another position as a reasonable accommodation.

205.    Again, this process of appeal directly involved original decision makers who decided to terminate her, making it clearly a sham process that truly only existed so Defendant could claim to have considered her appeal.

206.    Additionally, while pretending to search for reassignment roles HR consistently misrepresented the merit status of positions offered as reassignment, proposing a downgrade in

role and benefits instead, would delay responses on positions when specifically suggested allowing them to state the position was no longer available or conjuring up a reason why Plaintiff was unqualified without providing reason a comparator could not or would not be provided.

207.    As a result of prolonged disability discrimination, retaliation, and a hostile work environment, Plaintiff experienced a significant decline in her mental and physical health, experienced financial losses, housing issues, and severe career disruption.

### CLAIMS FOR RELIEF

### COUNTS I & II
*Disability Discrimination Under*
*the Americans with Disabilities Act and Rehabilitation Act*
*Failure to Accommodate*

208.    Plaintiff incorporates all of the allegations in the preceding paragraphs as if fully restated herein.

209.    Plaintiff is a qualified person with a disability.

210.    Plaintiff was fully able to execute her duties when she was accommodated, and even executed her duties when she was not accommodated.

211.    Plaintiff's disabilities substantially impede her in the major life activities of reading, writing, retaining information, communicating information, analyzing information, remaining focused and on task, and being able to organize her thoughts.

212.    Within the statutory period Plaintiff specifically requested accommodations that were reasonable and caused Defendant no undue burden.

213.    Plaintiff's treating providers documented Plaintiff's disabilities and made recommendations for reasonable accommodation, to which Defendant did not properly respond.

214.    As described herein, Plaintiff was denied reasonable accommodation during the statutory period.

215.    Defendant failed to engage in a good faith interactive process to find reasonable accommodations for Plaintiff.

216.    Defendant intentionally delayed responding to correspondence and demanded duplicative and unnecessary documentation for the purpose of slowing down the interactive process.

217.    And as otherwise described herein, Defendant sabotaged and interfered with Plaintiff's reasonable accommodations to cause her mental stress and anguish.

218.    As a direct and proximate cause of Defendant's actions, Plaintiff has suffered severe mental and emotional harm, and she now seeks compensation of not less than $1,000,000 for each of her ADA and RA claims, including costs, attorneys' fees and interest.

### COUNT III & IV
*Retaliation Under the*
*Americans with Disabilities Act and Rehabilitation Act*

219.    Plaintiff incorporates all of the allegations in the preceding paragraphs as if fully restated herein.

220.    On or about September 17, 2024, Plaintiff engaged in protected activity by filing an EEOC Charge.

221.    Defendant was made aware of Plaintiff's EEOC charge no later than December of 2024.

222.    As described in the facts above, Defendant retaliated against Plaintiff by escalating workplace harassment, intentionally sabotaging her promotional opportunities (including specific incidents on February 16 and 18, 2025), improperly managing her leave requests, and ultimately terminating her employment on April 22, 2025 in close temporal proximity with EEOC activity.

223.    Defendant took adverse action against Plaintiff by placing her on involuntary leave and ultimately by terminating her employment.

224. Defendant's decision to terminate Plaintiff was directly correlated to Plaintiff's need and request for reasonable accommodation, in that Defendants professed reason for terminating Plaintiff's employment was its belief that she could not execute her duties due to her disability.

225. This constitutes an admission that but for Plaintiff's need for accommodation, she would not have been discharged.

226. As a direct and proximate cause of Defendant's actions, Plaintiff has suffered severe mental and emotional harm, and she now seeks compensation of not less than $1,000,000 for each of her ADA and RA claims, including costs, attorneys' fees and interest.

## COUNT V
*Retaliatory Hostile Work Environment*
*Under the Americans with Disabilities Act*

227. Plaintiff incorporates all of the allegations in the preceding paragraphs as if fully restated herein.

228. Plaintiff engaged in protected activities in September of 2024.

229. Defendant was aware of Plaintiff's protected activity as described above.

230. As described in the facts above, Defendant created a retaliatory hostile work environment against Plaintiff by repeated denigrating comments, denial of work opportunities, isolation of Plaintiff from her colleagues, undermining Plaintiff's work and interfering with her ability to execute her duties.

231. Defendant also created a hostile work environment by intentionally forcing Plaintiff to repeatedly resubmit and justify her need for reasonable accommodation.

232. Defendant created a hostile work environment by essentially accusing Plaintiff of malingering and disbelieving her need for an accommodation.

28

233.    Defendant's creation of a hostile work environment for Plaintiff was specifically related to Plaintiff's need for accommodation, and there is no evidence that Plaintiff was unsuccessful in her job for any other reason.

234.    The close temporal proximity and explicit retaliatory actions establish a direct causal link between Plaintiff's protected activities and Defendant's creation of a hostile work environment. As a direct and proximate cause of Defendant's actions, Plaintiff has suffered severe mental and emotional harm, and she now seeks compensation of not less than $500,000 including costs, attorneys' fees and interest.

**COUNT VI & VII**
*Interference and*
*Retaliation Under the Family and Medical Leave Act*

235.    Plaintiff incorporates all of the allegations in the preceding paragraphs as if fully restated herein.

236.    Plaintiff was employed long enough to be entitled to FMLA leave, and Defendant is an employer subject to the FMLA.

237.    As described herein, Plaintiff applied for and was denied FMLA leave during the statutory period.

238.    Plaintiff was eligible and approved for FMLA leave due to her documented serious health conditions.

239.    Defendant was aware of Plaintiff's need for FMLA leave because Plaintiff provided documentation of her need for intermittent time off, including documentation from medical professionals.

240.    Defendant demonstrated hostility and animus towards Plaintiff by indicating that it did not believe that Plaintiff suffered from medical conditions that required time off.

241. Despite Plaintiff providing ample notice and documentation, Defendant interfered by miscalculating leave balances, repeatedly denying legitimate leave requests, demanding excessive and unnecessary medical documentation.

242. Defendant retaliated against Plaintiff for needing and using FMLA leave when it terminated her employment on April 22, 2025.

243. As a direct and proximate cause of Defendant's actions, Plaintiff has suffered severe mental and emotional harm, and she now seeks compensation of not less than $1,000,000 including costs, attorneys' fees and interest.

**COUNTS VIII & IX**
*Disability Discrimination, and Retaliation*
*Under the Virginia Human Rights Act (Va. Code § 2.2-3900 et seq.)*

244. Plaintiff incorporates all of the allegations in the preceding paragraphs as if fully restated herein.

245. Under the Virginia Human Rights Act, a plaintiff must demonstrate (1) she is a member of a protected class (disability), (2) she suffered an adverse employment action, (3) at the time of the adverse action she was performing her job satisfactorily, and (4) the adverse action occurred under circumstances suggesting discrimination.

246. Plaintiff meets this standard as she is a documented member of a protected class due to her disabilities, faced adverse employment actions including denial of accommodations, interference with leave, retaliatory actions for asserting her rights, and wrongful termination.

247. Despite Plaintiff's satisfactory job performance, Defendant repeatedly failed to engage in an interactive process, offered unsuitable reassignment options, and ultimately terminated her, thus establishing clear circumstances suggesting discriminatory intent based on Plaintiff's disability.

248.    These actions directly violate Plaintiff's rights under the Virginia Human Rights Act, as Defendant's discriminatory and retaliatory conduct was based upon Plaintiff's documented disabilities.

249.    As a direct and proximate cause of Defendant's actions, Plaintiff has suffered severe mental and emotional harm, and she now seeks compensation of not less than $1,000,000 including costs, attorneys' fees and interest.

<strong><u>PRAYER FOR RELIEF</u></strong>

**WHEREFORE,** Plaintiff respectfully requests that this Court enter judgment in her favor and against The County of Fairfax, and awards the following relief:

A.  Compensatory damages as described herein;

B.  Liquidated damages as permitted by law;

C.  Lost wages, back pay, and front pay;

D.  Reinstatement or appropriate equitable relief;

E.  Attorney's fees and costs, pursuant to 42 U.S.C. § 1988, 31 U.S.C. § 3730(h), and other applicable provisions;

F.  Pre- and post-judgment interest; and

G.  Any such other and further relief as the Court deems just and proper.

<strong><u>JURY DEMAND</u></strong>

Plaintiff demands a jury trial on claims so triable.

Respectfully submitted,

JESSICA SECKMAN
By Counsel

/s/ *Thomas J. Curcio*

31

Thomas J. Curcio (VSB #23016)
CURCIO LAW
700 North Fairfax Street, Suite 505
Alexandria, Virginia 22314
Telephone: (703) 836-3366
Facsimile: (703) 836-3360
Email: tcurcio@curciolaw.com

s/ Pamela M. Keith
Pamela M. Keith (*Pro Hac*)
Raymond K. Gordineer Jr. (*Pro Hac*)
Center For Employment Justice, LLC
650 Massachusetts Ave. NW
Suite 600
818-800-0292
pamkeith@centerforemploymentjustice.com
raygordineer@centerforemploymentjustice.com

***Attorneys for Plaintiffs***

<b><u>CERTIFICATE OF SERVICE</u></b>

I hereby certify that a true copy of the foregoing document was sent via electronic mail using the Court's CM/ECF system, and I will also serve a copy of the foregoing via email to the following on this 6th day of March, 2026 to:.

Christina M. Hamilton, Esq.
Virginia Bar Number 97833
Attorney for Fairfax County
Office of the County Attorney
12000 Government Center Parkway, Suite 549
Fairfax, Virginia 22035-0064
(703) 324-2421
(703) 324-2665 fax
Christina.Hamilton@fairfaxcounty.gov
*Counsel for Defendant*

32

_/s/ Thomas J. Curcio__  _____
Thomas J. Curcio (VSB#: 23016)